**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ALMA ROSA GODINEZ,

Plaintiff,

v.

JORGE MALENO HUERTA, *et al*.,

Defendants.

Case No. 16-cv-0236 BAS-NLS

**ORDER:**

**(1) GRANTING SUMMARY JUDGMENT FOR DEFENDANT LOPEZ**

**AND**

**(2) GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT FOR DEFENDANT MALENA HUERTA**

**[ECF No. 23]**

Plaintiff Alma Godinez brings this §1983 action against Deputies Maleno Huerta ("Maleno") and Lopez alleging: (1) unlawful entry without a warrant, (2) illegal search, (3) excessive force, (4) wrongful arrest, (5) wrongful detention, (6) violations of California Civil Code §52.1 and (7) malicious prosecution. (ECF No. 1.) Defendants move for summary judgment arguing: (1) plaintiff is collaterally estopped by findings at her preliminary hearing and probation revocation hearing; (2) insufficient evidence supports any cause of action for excessive force; (3) Defendants are entitled to qualified immunity; and (4) insufficient evidence supports any causes of action against Deputy Lopez. (ECF No. 23 (Defendants' Motion for Summary

Judgment ("MSJ")).) Ms. Godinez has opposed Defendants' motion. (ECF No. 25 (Response in Opposition to the MSJ ("Opp'n")).)

For the reasons stated below, the Court agrees that there is insufficient evidence to support Ms. Godinez's claims against Deputy Lopez, and that both officers are entitled to qualified immunity for the initial entry. The Court, however, denies Defendants' motion in all other respects as to Defendant Maleno.

# I. STATEMENT OF FACTS

## A. Deputy Maleno

On February 2, 2015, Deputy Maleno responded to a call at Ms. Godinez's home. (ECF No. 29 ¶2 (Joint Statement of Undisputed Facts ("JSUF")).) Kevin Thornton was outside the home and told Deputy Maleno that he lived at the home with his girlfriend Ms. Godinez. (MSJ, Ex. A at 75:18–21, 75:23–76:12 (Excerpts of Dep. Tr. of Deputy Maleno ("Maleno Dep.")).) Mr. Thornton told Deputy Maleno he had gotten into an argument with his girlfriend, Ms. Godinez, and that he needed to retrieve his belongings from the residence. (MSJ, Ex. B at 45:6–8 (Excerpts of Dep. Tr. of Angela Lopez ("Lopez Dep.")).) Mr. Thornton said the keys to his truck, which was parked outside the residence, were inside Ms. Godinez's apartment and he could not leave because Ms. Godinez had his truck keys. (MSJ, Ex. C ¶8 (Decl. of Michael David Blaylock ("Blaylock Decl.")).)

Deputy Maleno did nothing else to confirm that Mr. Thornton lived at the house. (Maleno Dep. at 77:17–20.) And, in fact, during an earlier dispatch call, Mr. Thornton had denied living with Ms. Godinez at this residence. (Opp'n, Ex. 13.)[1]

Mr. Thornton and Dep. Maleno knocked at the front door, yelling that deputies were present and that Thornton only wanted to retrieve some belongings he had left

[1] A neighbor, retired police officer Michael Blaylock, states that he too believed Mr. Thornton lived with Ms. Godinez at the residence. (Blaylock Decl. ¶¶2, 5.) However, Ms. Godinez denies living with Mr. Thornton and denies that he was ever her boyfriend, stating that he was only her employer, and that she had recently quit her job with him. (Godinez Decl. ¶2.)

at the home, but no one responded. (Lopez Dep. at 50:4–9, 50:24–25.) Deputy Maleno asked Mr. Thornton what he wanted to do next. Mr. Thornton asked if he could force his way in, and Deputy Maleno said he could if that was in fact his residence. (MSJ, Ex. D at 14:13–19 (Preliminary Hearing Transcript ("PH")).) Mr. Thornton went around back, and Deputy Maleno accompanied him to make sure there were no arguments or physical violence. (Maleno Dep. at 76:16–18.)

Mr. Thornton forced his way into the residence with his shoulder. (*Id.* at 85:2–3.) When Mr. Thornton forced in the door, Ms. Godinez, who was right behind the door, was knocked to the ground. (Opp'n, Ex. 1 ¶9 (Decl. of Alma Godinez ("Godinez Decl.")).) Deputy Maleno followed Mr. Thornton into the residence. What transpired next varies drastically depending upon whose testimony is found to be credible.

Deputy Maleno testified that he initially saw Ms. Godinez on the floor with a bat near her. He asked if she was okay, approached her and offered to help her up. (Maleno Dep. at 85:11–15.) In response, she jumped to her feet, raised the bat up and yelled "get out." (*Id.* at 86:11–13.) She then got into a "fighting stance" with the bat. (*Id*. at 90:16–18.) Deputy Maleno drew his Taser and demanded that she drop the bat several times. (*Id.* at 19:13, 19:19-20.) Ms. Godinez started a swinging motion with the bat and, in response, he fired his Taser. (*Id.* at 93:16–19.) The shock of the Taser shocked her enough so that she dropped the bat, but was not effective at penetrating her thick bathrobe so she did not drop to the ground the way he commanded. (PH at 19:5–9.) Because she refused his command to get down on the ground, he used his Taser again in "drive-stun mode" to get her to the ground so he could handcuff her. (Maleno Dep. at 99:18–20.)

Ms. Godinez, on the other hand, states that after she was knocked to the floor by the forced entry, she remained on the floor. She denies standing up or grabbing the bat. (Godinez Decl. ¶10.) She states that she was "crab-walking" backwards with her bottom on the floor when Deputy Maleno fired the Taser at her. (*Id*.)

Ms. Godinez was subsequently arrested and charged with (1) resisting or obstruction a police officer under California Penal Code §148(a)(1), and (2) assault on a peace officer with a deadly weapon, other than a firearm, by means likely to produce great bodily injury, pursuant to California Penal Code §245(c). According to Ms. Godinez, after her arrest, and while she sat in a patrol car outside her home, she saw Deputy Maleno go in and out of her house several times without her consent. (Godinez Decl. ¶18.)

**B. Deputy Lopez**

Deputy Lopez arrived on the scene after Deputy Maleno. (Lopez Dep. at 43:2–3.) She overheard Mr. Thornton tell Deputy Maleno that he had gotten into an argument with his girlfriend, and that he needed to get his stuff out of the residence he shared with her. (*Id.* at 45:6–8.) Deputy Lopez stood with Deputy Maleno and Mr. Thornton as they knocked at the front door and shouted out that they merely wanted to retrieve belongings.

When Deputy Maleno and Mr. Thornton went around back, Deputy Lopez waited by the front door until she heard Deputy Maleno yell, "Put the bat down" several times. (*Id.* at 52:16–18.) Deputy Lopez then ran around to the back of the house, but by the time she saw Ms. Godinez for the first time, Deputy Maleno had already fired his Taser. (*Id.* at 57:7–8.) She did not witness any of the Tasing or the events immediately leading up to the Tasing. (*Id.* at 59:23–24.)

Deputy Lopez assisted Deputy Maleno in handcuffing Ms. Godinez. (*Id.* at 60:8–12.) Deputy Lopez testified that Ms. Godinez was not cooperating. (*Id.*) Ms. Godinez states that she did nothing to resist or fight the deputies. (Godinez Decl. ¶10.) Ms. Godinez states that, in applying the handcuffs, "Deputy Lopez dug her nails into my arms and roughly forced my arms behind my back, causing me a great deal of pain." (*Id.*)

**C. Preliminary Hearing/Probation Revocation Hearing**

Ms. Godinez was on probation for a previous conviction. (PH at 1:10–12.)

Therefore, the court jointly held a probation revocation hearing with the preliminary hearing on her charges for assault on a peace officer and resisting. After the evidentiary hearing, at which Ms. Godinez did not testify, the judge found there was sufficient probable cause to bind Ms. Godinez over on the charges for trial, although the judge repeatedly made reference to the fact that "this is a preliminary exam and the standard is so low." (*Id.* at 46:6–18.) The judge also revoked Ms. Godinez's probation based on the evidence presented, finding that Ms. Godinez had failed to remain law-abiding "although not on a beyond-a-reasonable-doubt standard, certainly." (*Id.* at 52:27–28.)

At a later date, the District Attorney dismissed the charges against Ms. Godinez and proceeded to sentencing only on the probation revocation. (MSJ, Ex. F.) The court reinstated Ms. Godinez on probation on the same terms and conditions. (*Id*. Exs. E, F.)

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the

burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). "The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact. *Kennan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 242, 252). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

### A. Collateral Estoppel under California Law

Under California law, collateral estoppel or "issue preclusion" directs that "an issue necessarily decided in a prior litigation may be conclusively determined as against the parties . . . in a subsequent lawsuit on a different cause of action." *People v. Quarterman*, 202 Cal. App. 4th 1280, 1288 (Cal. Ct. App. 2012) (quotations omitted). "Federal courts must give 'preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so.'" *Wige v. City of Los Angeles*, 713 F.3d 1183, 1185 (9th Cir. 2013) (quoting *Allen v. McCurry*, 449 U.S. 90, 96 (1980)).

In California, issue preclusion applies when: "(1) the issue sought to be relitigated [is] identical to the issue decided in the earlier action, (2) the issue [is] actually litigated and (3) necessarily decided in the earlier action, (4) the earlier decision [was] final and made on the merits, and (5) the party against whom the issue preclusion is asserted [was] a party to the earlier action." *Wige*, 713 F.3d at 1185 (citing *Lucido v. Superior Court*, 51 Cal. 3d 335, 341 (Cal. 1990)). Even when these threshold requirements have been met, however, "policy considerations" may limit the use of issue preclusion when the "underpinnings of the doctrine are outweighed by other factors." *Quarterman*, 202 Cal. App. 4th at 1288. Thus, a court should first consider whether the threshold considerations are met, and then analyze whether public policy is served by applying the doctrine. *Id.*

Although, as a general rule, issue preclusion applies after a preliminary hearing probable cause determination is made to bar a subsequent civil action for false arrest and malicious prosecution, "issue preclusion should be denied 'where the plaintiff alleges that the arresting officer lied or fabricated evidence presented at the preliminary hearing.'" *Wige*, 713 F.3d at 1186 (quoting *McCutcheon v. City of Montclair*, 73 Cal. App. 4th 1138, 1146 (Cal. Ct. App. 1999)). If there are questions of fact as to whether the officer lied or fabricated evidence, this generally cannot be

resolved on summary judgment by using the doctrine of issue preclusion. *Id.*

Defendants argue the Superior Court's findings at the preliminary hearing/probation revocation hearing preclude relitigating the issues pertaining to Ms. Godinez's arrest now in this §1983 action. However, with respect to the probable cause determination made at the preliminary hearing, a material question of fact now remains as to whether Deputy Maleno lied at the preliminary hearing. Because plaintiff raises a legitimate question of fact on this issue and presents examples of contradictory testimony supporting her claim, (*Compare* Opp'n at 6–7 *with id.* at 10–11), the Court declines to grant summary judgment based on the Superior Court's determination of probable cause.

With respect to the findings resulting in the probation revocation, the Court finds that the first threshold requirement has not been met. Although the Superior Court found that Ms. Godinez had failed to remain law-abiding, (*see* PH 46:6–18), the basis for this conclusion is not clear from the record. Nor does it preclude a finding that the officers illegally entered, searched or used excessive force against her. The second requirement for application of collateral estoppel has also not been met. Ms. Godinez did not actually litigate the issues during the hearing. The hearing was held before Ms. Godinez's attorney had an opportunity to explore her allegations. Facing serious criminal charges, Ms. Godinez exercised her Fifth Amendment right not to testify at the preliminary hearing and relied on her counsel. Ultimately, the criminal charges were dismissed and Ms. Godinez was simply reinstated on probation.

To the extent all threshold requirements for application of issue preclusion were to exist, the Court would nevertheless decline to hold that Ms. Godinez is collaterally estopped from raising her claims under the circumstances of this case. Ms. Godinez now alleges that Deputy Maleno lied or fabricated evidence at the hearing underlying the judge's probable cause determination. "Preservation of the integrity of the judicial system", a "fundamental principle" underlying the doctrine

of collateral estoppel, *see Quarterman*, 202 Cal. App. 4th at 1288, cannot be advanced in the face of such allegations. *See also Lucido*, 51 Cal. 3d at 343, 350.

**B. Lack of Excessive Force**

Defendants move for summary judgment on the excessive force cause of action arguing Deputy Maleno's "limited use of force was reasonable to end the immediate threat of injury." (MSJ at 10.) "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and citation omitted). A court must first consider the nature and quality of the intrusion, evaluating the type and amount of force inflicted. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1279–80 (9th Cir. 2001)); *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). Next, the court must determine the government's interest at stake in the use of force, weighing factors "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Mattos*, 661 F.3d at 441 (citing *Deorle*, 272 F.3d at 1279–80). "These factors, however, are not exclusive. Rather, [courts should] examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in Graham.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).

The reasonableness of a particular use of force requires taking the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The right to make an arrest carries with it the right to employ some level of force to effect it." *Bryan*, 630 F.3d at 818 (citing *Graham*, 490 U.S. at 396). Thus, a "court must consider that the officer may be reacting to a

dynamic and evolving situation, requiring the officer to make split-second decisions." *Id*. (citing *Graham*, 490 U.S. at 396-97). "[A]n officer need not have perfect judgment, nor must he resort only to the least amount of force necessary to accomplish legitimate law enforcement objectives." *Id*.

Because the excessive force inquiry ordinarily "requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has emphasized that "summary judgment . . . in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)); *see also Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) ("Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is a question of fact best resolved by a jury."). That is particularly true in a case such as this one where the issues of fact are very much in dispute. If, in fact, Deputy Maleno used his Taser in response to Ms. Godinez's swinging a bat at him, then his arguments might have merit. His counsel ignores, however, that there are facts presented that contradict this version of the events. (*See* Opp'n at 6–7.) Because a material issue of fact remains, the reasonableness of his use of force against Ms. Godinez must be determined by a jury.

**C. Qualified Immunity**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity shields an officer from liability even if his or her action resulted from "'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id*. (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)). The purpose of qualified immunity is to strike a balance between the competing "need to hold public officials accountable when they exercise power

irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*.

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Supreme Court has instructed that courts may exercise "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson*, 555 U.S. at 236. If facts necessary to decide the issue of qualified immunity are in dispute, then summary judgment granting qualified immunity is not proper. *LaLonde v. Cty. of Riverside*, 204 F.3d 947, 953–54 (9th Cir. 2000).

For the second step in the qualified immunity analysis—whether the constitutional right was clearly established at the time of the conduct—courts ask whether its contours were "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S.731, 739 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. The Supreme Court has made "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Courts "are particularly mindful of this principle in the context of Fourth Amendment cases, where the constitutional standard—reasonableness—is always a very fact-specific inquiry." *Mattos*, 661 F.3d at 442. "If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment." *Id*.; *see also Deorle*, 272 F.3d at 1286 ("Otherwise, officers would escape responsibility for the most

egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct.”).

Courts should be “careful, however, to apply the clearly established rule in such a way that faithfully guards the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.” *Id.* (citing *Harlow*, 457 U.S. at 807 (internal quotation marks and citations omitted)). Courts “must also allow ‘for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.’” *Id*. (quoting *Graham*, 490 U.S. at 396–97). While “in an obvious case, [the *Graham* standards for excessive force] can clearly establish the answer, even without a body of relevant case law,” the “bar for finding such obviousness is quite high.” *Id.* (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). In *al-Kidd*, the Supreme Court emphasized that it has “repeatedly told courts not to define clearly established law at a high level of generality.” *Id*. (quoting *al-Kidd*, 563 U.S. at 741).

**1. Count One: Unlawful Entry without a Warrant**

An officer may enter property without a warrant if he has the consent of the resident or if he believes there is an emergency at hand and his entry is necessary for protection of life or property. *Illinois v. Rodriguez*, 497 U.S. 177 (1990) (consent of co-occupant); *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005) (emergency exception). For the former to apply, the police must obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the residence. *Rodiguez*, 497 U.S. at 186. For the emergency exception to apply, (1) the police must have reasonable grounds to believe there is an emergency at hand and an immediate need for their assistance for protection life or property, (2) entrance must not primarily be motivated by intent to arrest and seize evidence, and (3) the police officer must have a reasonable basis to associate the emergency with the area

or place entered or searched. *Martinez,* 406 F.3d at 1164.

At the time Deputy Maleno entered the property, he was told by Mr. Thornton that Mr. Thornton shared the residence with Ms. Godinez. (Maleno Dep. at 75:18–21.) Furthermore, Mr. Thornton had indisputably knocked Ms. Godinez to the ground after forcing his way inside the residence. (Godinez Decl. ¶9; Maleno Dep. at 85:11–15.) Under the emergency exception, Deputy Maleno was entitled to enter the residence without a warrant to determine whether Ms. Godinez required assistance. To the extent Deputy Maleno was already on the property at the time he realized Ms. Godinez had been knocked to the ground, he reasonably believed that he had permission from Mr. Thornton to be there. There is no evidence to support Ms. Godinez's theory that Deputy Maleno was primarily motivated by an intent to arrest her or search the property.

Therefore, the Court finds that at the time Deputy Maleno first entered the house, an unconstitutional warrantless entry into the residence did not occur. Ms. Godinez argues that Deputy Maleno should have done more to confirm that Mr. Thornton actually lived at the house and should not have allowed Mr. Thornton to force his way in without more proof about whether Mr. Thornton in fact resided at the residence or otherwise had permission to enter. However, when Deputy Maleno arrived at the scene, the undisputed evidence shows that Mr. Thornton told Deputy Maleno that he needed to retrieve his belongings including keys for his truck parked outside the residence. (Blaylock Decl. ¶8; Lopez Dep. at 45:6–8.) This statement was confirmed for the Deputy Maleno when Mr. Thornton knocked on the front door with the Deputy Maleno and yelled out that he just wanted to retrieve his belongings. (Lopez Dep. at 50:4–9, 50:24–25.) A neighbor similarly believed that Mr. Thornton was living with Ms. Godinez. (Blaylock Decl. ¶¶2, 5.) Even if the deputies violated a constitutional right, under the facts of this case, it was not sufficiently clear that a reasonable official would have understood that what he was doing violated that right. The officers responded to a potential domestic violence situation. They were there

to help Mr. Thornton retrieve his belongings without violence. Deputy Maleno told Mr. Thornton he could only force his way in if he lived there. In light of all the facts of the case, the Court finds that qualified immunity protects Deputy Maleno from liability for the initial warrantless entry.

**2. Remaining Counts**

However, Ms. Godinez then states that Deputy Maleno fired a Taser at her, while she was unarmed and trying to get away from him. (Godinez Decl. ¶10.) She claims that he manufactured evidence against her to arrest her and cover up his unlawful use of the Taser. (Opp'n at 13–16.) And she claims that she saw him going in and out of her house searching the house after she was arrested. (Godinez Decl. ¶18.) Taking these facts in the light most favorable to Ms. Godinez, as the Court must do on summary judgment, Ms. Godinez has shown at this stage of the proceedings a constitutional violation that would have been clear to any reasonable officer. As the Ninth Circuit stated in *Gravelet-Blondin*, the "right to be free from the application of non-trivial force for engaging in mere passive resistance was clear prior to 2008." *Gravelet-Blondin*, 728 F.3d at 1093 (citing *Nelson*, 685 F.3d at 881); *see also Cordeiro v. United States*, No. 11-00413 JMS, 2013 WL 5514504, at *12 (D. Haw. Oct. 3, 2013) (summarizing case law). Thus, assuming Ms. Godinez's version of the events is correct, she was at most passively resisting Deputy Maleno's command to lie flat on the ground at the time he fired a Taser at her. This is not conduct that is entitled to qualified immunity.

**D. Deputy Lopez**

Defendants argue that insufficient facts support any liability for Deputy Lopez. The Court agrees. It is undisputed that Deputy Lopez did not enter the house until after the incident occurred. At the time Mr. Thornton was forcing his way into the house, Deputy Lopez was in the front of the house. (Lopez Dep. at 52:16–18.) There are no facts supporting any claim that she forced entry or searched the premises. Furthermore, Deputy Lopez was not present when Deputy Maleno fired his Taser,

so, to the extent she participated in the detention and arrest, her conduct was based on representations by Deputy Maleno that he had acted in self-defense and that Ms. Godinez had attempted to hit him with a bat. The evidence shows that any illegal entry after Deputy Maleno's use of a Taser, wrongful arrest, wrongful detention or malicious prosecution was based on actions by Deputy Maleno, not Deputy Lopez.

Finally, Ms. Godinez alleges that Deputy Lopez used excessive force during her arrest because while applying handcuffs, "Deputy Lopez dug her nails into my arms and roughly forced my arms behind my back, causing me a great deal of pain." (Godinez Decl. ¶10.) "When determining whether the force was excessive, courts look to the 'extent of the injury . . . the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials and any efforts made to temper the severity of a forceful response.'" *Smith v. Sergent*, No. 12:15-cv-0979 GEB DB P, 2017 WL 4284659, at *3 (E.D. Cal. Sept. 27, 2017) (quoting *Hudson v. McMillan*, 503 U.S. 1, 7 (1992)).

In this case, Ms. Godinez does not allege any permanent injury. She simply claims that Deputy Lopez was rough and dug her nails into her arms when attempting to handcuff her. Just before Deputy Lopez entered the residence and handcuffed Ms. Godinez, Deputy Lopez heard Deputy Maleno tell Ms. Godinez to drop the bat. Even assuming Ms. Godinez's statements are all true, and she was not resisting at the time Deputy Lopez was actually applying the handcuffs, Deputy Lopez reasonably perceived that Ms. Godinez was a threat. In light of these facts, the force used by Deputy Lopez was not unconstitutionally excessive. To the extent the information Deputy Lopez received was incorrect, the force she used in handcuffing Ms. Godinez did not violate a clearly established constitutional or statutory right, and, therefore, Deputy Lopez is entitled to qualified immunity for her conduct.

## IV. CONCLUSION & ORDER

In light of the foregoing, the Court **HEREBY ORDERS** that:

1. Defendants' Motion for Summary Judgment (ECF No. 23) is

**GRANTED** on behalf of Deputy Lopez in its entirety and as to Count One with respect to Deputy Maleno.

2. Defendants' Motion for Summary Judgment (ECF No. 23) is **DENIED** on behalf of Deputy Maleno as to all remaining counts.

3. Deputy Lopez is **HEREBY DISMISSED** from the case.

**IT IS SO ORDERED.**

**DATED: November 16, 2017**

**Hon. Cynthia Bashant**
**United States District Judge**